AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

Medical Offices of Dr. Armando Figueroa
650 Pennsylvania Ave, SE
Suite 380
Washington, DC 20003

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I  DEA Investigator Sandra White-Hope  being duly sworn depose and say:

I am a(n)  Investigator with the Drug Enforcement Administration  and have reason to believe
(Official Title)

that (name, description and or location): Multi-story building, affixed with a marquee type entrance with guard and cameras to monitor each entry and exit to and from the building. Upon entering the main facility the physicians office is located on the third floor labeled as Suite 380.

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)
    SEE ATTACHMENT A

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

    Records and medical documents

concerning a violation of Title 21 USC  United States Code, Section(s) 846 . The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.      ☒   YES      NO

                                                                          _____
                                                                          Signature of Affiant

Darlene M. Soltys, AUSA
Organized Crime & Narcotics Trafficking
(202) 514-8147

Sworn to before me, and subscribed in my presence

_____           at Washington, D.C.
Date

_____           _____
Name and Title of Judicial Officer          Signature of Judicial Officer

1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | SEARCH WARRANT |
| | ) | |
| THE MEDICAL OFFICE OF | ) | |
| ARMANDO B. FIGUEROA MD | ) | |
| 650 PENNSYLVANIA AVENUE, SE | ) | |
| SUITE 380 | ) | |
| WASHINGTON, DC 20003 | ) | |

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, SANDRA K. WHITE-HOPE, being duly sworn, depose and state as follows:

**I.      INTRODUCTION**

1. I am a Diversion Investigator (DI) with the United States Department of Justice (DOJ), Drug Enforcement Administration (DEA) and have been so employed since January 2004. Currently as a Diversion Investigator, your Affiant has received over five hundred (500) hours of specialized training in the area of investigating drug diversion. Your Affiant's area of responsibility includes the monitoring of all legitimate handlers of controlled substances for compliance with federal laws and regulations, and investigating complaints relating to the diversion of controlled substances from the legitimate channels in which they are manufactured, distributed and dispensed. As a Diversion Investigator, your Affiant is also responsible for monitoring the handling and distribution of precursor and essential chemicals pursuant to the 1988 Chemical Diversion and Trafficking Act. Accordingly, I am empowered by law to conduct investigations of offenses enumerated in Title 21, United States Code, including offenses involving the distribution of Oxycodone and other controlled

2

substances as specified in Title 21, United States Code, Sections 841(a)(1) and 846. I am currently assigned to the Washington Division Office. During my tenure as a Diversion Investigator with the DEA, I have conducted numerous criminal investigations, specifically pertaining to the illegal distribution of pharmaceutical controlled substances. I have worked with and am familiar with various investigative techniques as utilized by law enforcement, including, but not limited to, the purchase of narcotics as evidence of drug trafficking. I have been involved in directing or assisting numerous controlled purchases of narcotics. I have authored search warrants and arrest warrants and participated in the execution of the same.

2. As a Diversion Investigator, I have interviewed many individuals involved in trafficking controlled substances and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the techniques and methods drug traffickers use to transport and distribute controlled substances and conceal the proceeds they derive from sales of narcotics trafficking. I am also familiar with the use, effects, appearance and methods of manufacture of controlled substances.

3. Based on training and experience, I know that legally practicing Doctors:
   a) register with the Drug Enforcement Administration to prescribe controlled substances;
   b) maintain medical records, prescription records and information regarding patient care;
   c) conduct evaluations of and provide treatment for a patient's medical needs
   d) keep administrative records for charges for office visits, which may or may not be
      billed to the individual, or a federal, state or private medical insurer;

e) often incorporate their medical practice for tax advantages and liability purposes; and

4.    f) often deposit money earned from their practice in a personal or business bank account.

5.

6. 4. Title 21, United States Code, Section 841(a)(1) makes it an offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorized by law. With regard to physicians, controlled substances can only be prescribed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R., Sec. 1306.04 (a) an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription. Title 21, United States Code, Section 841(a)(1) is violated when the physician's authority to prescribe controlled substances is being used not for the treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or of dispensing controlled substances

7. **II.   REASON FOR AFFIDAVIT**

8. 5. This case is part of an Organized Crime and Drug Enforcement Task Force ("OCDETF") investigation (Operation "BOLIVIAN BAKERY"), which has focused on various drug traffickers, doctors, patients, and a pharmacist involved in the illegal distribution of pain medication, including various forms of the very potent, and widely-abused Schedule II Controlled Substance Oxycodone, (also known as "Percocet", "Endocet", "Roxicet", "OxyContin", "Percs", "Endo", "Roxies", "Vitamins", "Oxy", "O.C.", "Ocean City", "Green T-Shirts", "Hillbilly Heroin", "Killer", and "Coffin"). This OCDETF investigation is

4

supported by the DEA, FBI, HHS, Fairfax County Police, Arlington County Police, and Loudoun County Sheriff's Office and other state and local law enforcement offices. This affidavit supports an application for a search warrant for the real property, premises and curtilage known as the Medical Office of Dr. Armando Borja FIGUEROA, 650 Pennsylvania Avenue, SE Suite 380, Washington, DC 20003, as described further in <u>Attachment A</u> to this affidavit.

9. 6. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation as well as the observations of other law enforcement officers involved in this investigation. All observations that were not personally made by me were related to me by the person(s) who made such observations. This affidavit contains information necessary to support a finding of probable cause for this search warrant. Based on the information set forth below, your affiant has probable cause to believe that evidence of distribution of controlled substances for other than the usual course of professional practice and not for a legitimate medical purpose is located in the medical offices of Dr. FIGUEROA. There is probable cause to believe that Dr. FIGUEROA has unlawfully distributed controlled substances and committed violations of Title 21, United States Code, Sections 841 (a)(1) and that evidence of this crime will be found at Dr. FIGUEROA'S office. The specific items to be seized are set forth in <u>Attachment A.</u> The affidavit is not intended to include each and every fact and matter observed by me or known to the government.

10. **III.   <u>SUMMARY OF PROBABLE CAUSE</u>:**

11. 7. Dr. Armando FIGUEROA is registered with DEA and has been assigned DEA# BF0128810, which expires on September 30, 2010. Since 1999, Dr. Armando FIGUEROA

has reportedly been writing excessive numbers of prescriptions for non-legitimate medical purposes in the Washington, D.C. area.  In addition, he has allegedly written questionable prescriptions for Percocet, Lorcet, Hydrocodone, Dextroamphtamine Sulfate and Oxycodone without medical exams.  Intelligence information listed the following for Dr. Armando FIGUEROA: aliases Armand FIGUEROA, Armando FIGUEROA, and Armando LIGUEROA; addresses were listed for Armando B. FIGUEROA: 106 Irving St, N.W., 3000N, Washington, D.C. 20010; Telephone number: (202) 291-9317; Maryland Driver License: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; 1300 Crystal Dr, 502S, Arlington, VA  22202; 3112 Key Blvd., Arlington, VA 22201, 12413 Arrow Park Ct, Ft. Washington, MD  20744; 401 M St, SW, Washington, D.C.  20024.  Dr. Armando B. FIGUEROA is listed in the Physicians Directory, 650 Pennsylvania Ave., S.E., Suite 380, Washington, D.C.  20003; telephone number (202)675-8345, and is listed as an active Medical Doctor in the District of Columbia, license number ▓▓▓▓▓▓ issue date of 07/18/1968.

8. Presently, Dr. Armando FIGUEROA is involved in an on-going conspiracy with Elio Postigo, who is running an established network for the illegal distribution of prescription narcotics in Northern Virginia, Washington, D.C. and Florida.  Based on Confidential Source (CS) information, Elio Postigo pays FIGUEROA approximately $200 for each fraudulent prescription.  Elio Postigo distributes the drugs himself or through street distributors.  Elio Postigo utilizes telephone number 571-437-4574 to further his organization's activities.  Moreover, during Operation Bolivian Bakery, investigation revealed that Ernesto Postigo, the

son of Elio or Eliodor Postigo, sold quantities of oxycotin during controlled buys within the

6

past year, in the state of Virginia. On September 30, 2004, an administrative subpoena was sent to Nextel requesting tolls for

cellular telephone number (571) 437-4574. On January 11, 2005, Nextel complied with the aforementioned subpoena. A telecommunications Federal Court Order was sent to World Com (MCI) on April 11, 2005, to MCI for telephone number (703) 418-4195, which was in contact with the target telephone number (571) 437-4574 (POSTIGO'S) sixteen times from October 6 through October 31, 2004. MCI stated that telephone number (703) 418-4195 is subscribed to Armando FIGUEROA, 721 S. 21st, Arlington, VA  22202. Analysis of numerous pharmacy reports from various area pharmacies revealed listings for controlled substance prescriptions issued to patients by Dr. Armando FIGUEROA, DEA Registration BF0128810. These patients' names coincided with names that appeared on several Dialed Number Recorder reports (also referred to as a DNR or pen register) which monitored the activities of (703) 418-4195 subscribed to FIGUEROA and (571) 437-4574 utilized by Elio Postigo. The following names appeared on both the DNRs and the prescription records for Dr. Armando FIGUEROA from various area  pharmacies: Perry KESNER, Elio POSTIGO, Ali IZADPANAH, Simon RIVAS and David CLARK. Sandra STOVER, George REEDER, Jeff LEONARD,  Fred MIGUEL, Debra LAZARUS, Dwight REEDER, Jean REEDER, Kerry LEONARD, George LEONARD Jr., Brenda LEONARD, Angel RODRIGUEZ, Jamie WOOD, Dustin WOOD, John GODLEWSKI, Willie Mae JONES, Hooshang DORAFSHAN, Gertrude EVANS, William RHOAN, Raymond HOOSHANG, Louis WRAY, Debra RAWLS, Victoria MILLER, Cecilio SOTO, Ruth MELCHER, Kenneth GUNNING and William LAUDERMILK's name also appeared on several pharmacy reports.

7

9. DNR reports indicate substantial telephonic communication between Elio Postigo and the following individuals: Dr. Armando FIGUEROA, Perry KESNER, Simon RIVAS.

10. The pharmacy reports indicate that the above named people are patients of Dr. Figueroa, and that they have acquired unusually large numbers of prescriptions for oxycotin and other narcotics (that is, records indicate that they filled these prescriptions and received oxycotin pills and other narcotics outside of the norm of what would be medically necessary) signed by Dr. Figueroa from 2001 to the present.

11.

12.

13. **IV.  <u>EVIDENCE OF DRUG DISTRIBUTION</u>**

14. Sandra STOVER (Stover) and George REEDER (Reeder) had been patients of Dr. FIGUEROA since the early 1990s when they lived in Maryland. They both moved to Conway, South Carolina in 2001, but Stover continued to regularly make the 870 mile round trip drive to Dr. FIGUEROA's office to obtain prescriptions for controlled substances in both STOVER's and REEDER's names.

10. All prescriptions were issued on Dr. FIGUEROA's pre-printed prescriptions and manually signed by Dr. FIGUEROA, and left undated. Most prescriptions were for 90 dosage units of 80 mg. Oxycontin, a Schedule II narcotic, with dosing instructions of "1 to 2 tablets every 4-6 hours".

11. In April 2007, DEA investigators were notified by South Carolina narcotics investigators that over one hundred prescriptions from Dr. FIGUEROA had been

8

presented by STOVER and REEDER to South Carolina pharmacists in 2005 and 2006. They indicated that pharmaceutical drug abuse was a problem and that State law required that the pharmacist identify the patient and verify the prescription with the physician. Local interviews of pharmacists revealed that when Dr. FIGUEROA's office was contacted, Dr. FIGUEROA verified the prescriptions, often before hearing the patient's name. Investigators stated that Oxycontin had a street value in South Carolina of $50.00 to $60.00 per tablet. DEA investigators learned from local Washington area pharmacy traces that STOVER from time to time presented Figueroa's prescriptions to Maryland chain pharmacies.

12. A review of records for 2006 indicated that Dr. FIGUEROA issued STOVER and REEDER multiple prescriptions for the controlled substance Oxycontin [80 mg.] or its generic oxycodone nearly every two weeks. For example, in calendar year 2006, STOVER received 72 prescriptions for over 6,500 dosage units. STOVER paid $46,487.00 in cash to have these filled. Similarly, Dr. FIGUEROA made out 63 prescriptions in REEDER's name for a total of more than 5,900 dosage units at a retail purchase price of $33,698.00.

13. Through 2007, Dr. FIGUEROA continued to issue STOVER and REEDER multiple prescriptions for the controlled substances Oxycontin [80 mg.] or its generic Oxycodone, as well as the Schedule II controlled substance methadone (80 mg.). During this period, STOVER received 28 Oxycodone and 8 methadone prescriptions

for over 3,300 dosage units. STOVER paid $19,081.00 in cash to have these filled. Similarly, Dr. FIGUEROA made out 27 prescriptions in REEDER's name for a total of more than 2,500 dosage units at a retail purchase price of $21,439.00.

14. On October 14, 2007, DEA investigators were notified by a Maryland pharmacy that STOVER had presented an Oxycontin prescription in the name of George REEDER and paid over $1,000 in cash. STOVER was traced to a Maryland hotel by DEA task force members, who later were present when STOVER presented a prescription for oxycodone to a Maryland pharmacy and then returned to her hotel.

15. On October 17, 2007, officers arrested STOVER on multiple State counts of "Possession of Narcotics with Intent to Distribute". A search of the hotel room revealed a suitcase filled with $7,500.00 in cash, and numerous prescriptions bottles containing hundreds of tablets of oxycodone, methadone, and the Schedule IV controlled substances phentermine and diazepam. STOVER also had fifteen Figueroa prescriptions in an envelope and two more in her purse.

16. Investigators also seized handwritten lists of controlled substances from STOVER. She told investigators that she would prepare a list of prescriptions to include the drug, strength, quantity, and dosing instructions. The lists were predominantly for oxycodone but also included methadone, Valium and phentermine. She stated that when she provided the list to Dr. FIGUEROA at his office, he would mark the lists

10

with checks for prescriptions he provided and then tally and record the number for payment. She indicated that Dr. FIGUEROA had not performed any physical examination on herself or REEDER, but simply charged $100.00 per prescription. Investigators have also learned that at least one of Dr. Figueroa's employees, who is not registered with the DEA, is participating in his illegal prescription writing scheme, by writing prescriptions himself and receiving payments in the amount of $100.00 per prescriptions.

15.    **V.    RECORDS AND DOCUMENTS**

17. Based on your affiant's training, experience and conversations with other investigators, I know:

   a) that Dr. FIGUEROA and his staff utilize computers for conducting business, maintaining records and prescribing drugs to their patients; and the physician dictations, once transcribed, are copied to the office computer.

   b) that Dr. FIGUEROA maintains books, records, receipts, notes and prescription logs relating to prescribing of controlled substances.

   c) that physicians who are registered with the DEA are required to keep all records which document purchasing, dispensing, and administration of controlled substances for two years.

16.

17. 18.    Based on your affiant's training and experience, I know:

11

18. (a) that drug traffickers, in the regular course of business, commonly maintain and have quick access to U.S. currency or other liquid assets in order to maintain and finance their ongoing drug business by keeping cash and liquid assets and records of cash and liquid assets in their homes;

19. (b) narcotics trafficker commonly maintain books, records, receipts notes, ledgers, airline tickets, money orders, and/or other papers related to the transportation, ordering, sale, and distribution of controlled substances;

20. (c) narcotics traffickers commonly provide narcotics on consignment to their clients. The above mentioned books, records, receipts, notes, ledgers, and the like, are commonly maintained so that drug traffickers have ready access to them for the purposes of determining drug debts and collecting monies derived from the sale of drugs;

21. (d) it is common for drug traffickers to conceal contraband, proceeds of drugs transactions, and the records of those transactions within their residences or the curtilages of their residences, which include vehicles located on the curtilage of such property, for ready access or in other secure places, such as rented storage bins and stash houses and apartments, to hide them from law enforcement agents;

22. (e) drug traffickers commonly maintain address or telephone numbers in books or papers which reflect names, addresses, and telephone numbers for their associates in the drug trafficking organization;

23. (f) drug traffickers frequently take or cause to be taken photographs of themselves, their associates, their property, and their product, and these traffickers frequently maintain these photographs in their possession and in their residences;

12

24. (g) drug trafficker sometimes uses computers and electronic storage devices to list associates and keep track of debts, product on hand, drug proceeds, names, address, and telephone numbers of their associates; and

25. (h) drug traffickers sometimes use firearms to protect their drugs and drug proceeds.

26.

27. **VI**. <u>THE USE OF COMPUTERS TO MAINTAIN RELEVANT DATA</u>

19. As set forth above, there is probable cause to believe that some of the information for which this affidavit seeks authority to search is generated or stored on a computer. The affiant has requested the assistance of the DEA's Computer Forensics Team to aid in the search and seizure of computers and computer-generated evidence. Conducting a search of a computer system, documenting the search, and making evidentiary and discovery copies is a lengthy process. In the event the Court grants your affiant's request for this search warrant, it is your affiant's intention to have the Computer Forensic Team "image" or copy the hard drives of Dr. FIGUEROA'S computers on site to avoid any undue hardship to his practice. If it is determined that evidence exists on hard drives and cannot reasonably be removed from the hard drives on site either because of the risk of damaging or altering the evidence or because the removal of the evidence cannot be completed on site in a reasonable amount of time, the computers and related equipment will be seized and imaged in a controlled environment.

28.

29.    20. Based upon the facts discussed above, I believe that there is probable cause to

13

seize from Dr. FIGUEROA'S medical office, patient medical and billing files. By examining these patient files, I believe that I will discover more information related to Dr. FIGUEROA'S prescribing practices.

Based on the foregoing, probable cause exists to believe that the above described location contains property, constituting evidence of the commission of Title 21, United States Code, Section 841 (a)(1), unlawful distribution of controlled substances, the fruits of crime, property designed to or intended for use and which is and has been used as the means of committing the offense, and those items listed in Attachment A, which is incorporated herein by reference.

14

_____
Sandra K. White-Hope
DEA Diversion Investigator

Sworn and subscribed to before me this \_\_\_ day of      2007.

_____
The Honorable
United States Magistrate Judge

15

## ATTACHMENT A (LIST OF ITEMS TO BE SEIZED)

The following medical, patient, or all other records or information related to Dr. FIGUEROA'S medical practice which constitute evidence of violations of Title 21, United States Code, Section 841 (a)(1):

A.      Patient medical and billing files including, but not limited to, patient assessments and evaluations, patient consents, patient referral forms, prescription files, payment receipts, insurance records, correspondence, explanation of benefits forms, patient progress notes, claim forms, operative reports, charts and histories, test results, x-rays, billing statements, appointment logs, office sign-in-sheets, written correspondence, inter-office memoranda, facsimile messages and telephone messages in any form, limited to the names listed in paragraph E.

B.      Documents related to any complaints or inquiries into the medical practices of Dr. FIGUEROA or the conduct of his patients from other patients, their family members, anonymous sources, regulatory agencies, law enforcement agencies or any other sources.

C.      Records relating to the receipt of payments for medical services performed on patients, including accounting records, books of original entry, general ledgers, cash receipts journals, expense journals, disbursements records, patient ledger cards, bank statements, and any journal, ledger, or notebook containing entries of cash, personal checks, or credit card payments received, limited to the names listed in paragraph E.

D.      All personnel files and records sufficient to identify current and former employees or contractors associated with Dr. FIGUEROA'S medical practice, including date of birth, job title and description, dates and scheduled hours of employment, and home addresses and telephone numbers.

16

E.  All files pertaining to the patients listed below:

Eliodoro POSTIGO, Ernesto POSTIGO, Sandra STOVER, George REEDER, Dwight REEDER, David CLARK, Perry KESNER, Ali IZADPANAH, Simon RIVAS, Jeff LEONARD, Kerry LEONARD, George LEONARD Jr., Brenda LEONARD, Angel RODRIGUEZ, Jamie WOOD, Dustin WOOD, John GODLEWSKI, Willie Mae JONES, Hooshang DORAFSHAN, Gertrude EVANS, William, RHOAN, Raymond HOOSHANG, Louis WRAY, Debra RAWLS, Victoria MILLER, Cecilio SOTO, Ruth MELCHER, Kenneth GUNNING, William LAUDERMILK, Jean REEDER, Debra LAZARUS and Fred MIGUEL.

F.  All data, records and information described in paragraphs A - D that may be stored in electronic devices capable of analyzing, creating, displaying, converting, storing or transmitting electronic computer impulses or data including, but not limited to, electronic data processing and storage devices, computers and computer systems, and internal and/or peripheral storage devices.  In addition, the systems documentation, operating logs and documentation, passwords needed to access those systems, software and instruction manuals related to such electronic devices.

G.  If a determination is made during the search by a, Computer Forensics Examiner assigned the computer aspect of this search, that by extracting and copying information, described in paragraph E, contained in the computer or computer system and related computer equipment and storage devices, it cannot be assured of the recreation or the exact computer environment at the premises being searched; in accordance with good evidence processing practices, the following items are included for seizure:

17

- computers and computer equipment, including processing unit and circuit boards, attached or unattached to the computer;
  - magnetic storage media such as floppy diskettes, hard disk, and magnetic computer tape, and magnetic storage devices, such as read/write devices and read only devices, whether internal or external;
  - photo optical storage media, including but not limited to, compact disk type storage devices which are forms of storage devices for computer readable information;
  - computer peripheral devices attached or unattached to the computer including computer monitors, printers, keyboards, modems, acoustic couplers, or other physical devices which serve to transmit or receive information to or from a computer;
  - documents which serve the purpose of explaining the way the computer hardware, programs and data are used, including manuals for computer equipment and software, printouts of computer programs, data files or other information, which has been or continues to be stored electronically or magnetically in a computer system;
  - memory telephones, automatic dialing services, telephone answering machines, or any other electronic device used for the storage of names, addresses, and telephone numbers.